<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ED MULDER, on behalf of himself and all others similarly situated,<br><br>                Plaintiff,<br><br>v.<br><br>PCS HEALTH SYSTEMS, INC.,<br><br>                Defendant. | Civ. No. 98-1003 (WGB)<br><br><u>M E M O R A N D U M</u><br><u>O P I N I O N</u> |

<u>APPEARANCES</u>:

Andrew R. Jacobs, Esq.
EPSTEIN, FITZSIMMONS, BROWN,
GIOIA, JACOBS & SPROULS, P.C.
245 Green Village Road
P.O. Box 901
Chatham Township, New Jersey 07928

Arthur N. Abbey, Esq.
Jill S. Abrams, Esq.
Stephanie Amin-Giwner
ABBEY GARDY, LLP
212 East 39th Street
New York, New York 10016

      Attorneys for Plaintiff

Jeffrey J. Greenbaum, Esq.
SILLS CUMMIS RADIN TISCHMAN
EPSTEIN & GROSS, P.A.
One Riverfront Plaza
Newark, New Jersey 07102

Paul J. Ondrasik, Jr., Esq.
Martin D. Schneiderman, Esq.
Linda S. Stein, Esq.
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036

      Attorneys for Defendant

**BASSLER, SENIOR DISTRICT JUDGE:**

This class action presents the issue of whether a pharmaceutical benefits management company may be subject to the fiduciary obligations under the Employee Retirement Income Security Act of 1974 ("ERISA") for the services it provides to an HMO.[1]  Defendant moves for summary judgment on plaintiff's claim. For the reasons set forth below, the Court **grants** summary judgment.

**I. Background**

Plaintiff Ed Mulder ("Plaintiff") participated in an employee benefit plan sponsored by his employer Scott Printing Co. ("Scott").  Plaintiff received his health and prescription benefit coverage through Scott's employee benefit plan.  The Scott plan delegated authority and control of all health and prescription benefit coverage to Oxford Health Plans, Inc. ("Oxford"), a health maintenance organization.  Oxford retained defendant PCS Health Systems, Inc. ("PCS")[2] to manage its prescription drug benefits program.  PCS did not have a contractual relationship with Scott and was not compensated by

---

[1]  The Court has subject matter jurisdiction under 29 U.S.C. § 1132 and 28 U.S.C. § 1331. Venue is proper pursuant to 28 U.S.C. § 1391.

[2]  PCS Health Systems was purchased by Advance Paradigm and the resulting company name became AdvancePCS Health L.P.  As of March 2004, AdvancePCS became a Caremark company.  (Defendants' Motion for Summary Judgment at 1 n.1.)

Scott. (Defendant's Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment ("Def's UMF") at ¶ 7.)

After taking the prescription drug Mevacor, prescribed by his doctor, for over a year to lower his cholesterol, Plaintiff received a notice by mail that PCS was switching his drug to Pravachol. (Complaint at ¶ 7.) Plaintiff believes PCS switched his drug to increase its profits through "rebates and kickbacks" PCS receives from drug manufacturers. (Id. at ¶ 8.) Plaintiff brought this class action[3] claiming that PCS breached its fiduciary duties under ERISA.[4]

As a pharmaceutical benefits management ("PMB") services company, PCS's clients contracted for services geared towards the administration of their drug benefits program. PCS had provided PMB services to Oxford and its customer, Scott, during the class period, March 5, 1995 to March 5, 1998 ("class period"), pursuant to several different contracts that were in effect for various periods of time. (Plaintiff's Statement of Undisputed Material Facts in Opposition to Defendant's Motion for Summary Judgment

---

[3]  In its opinion dated July 17, 2003, this Court certified a class pursuant to Fed. R. Civ. P. 23(b)(2) "of all participants, from March 5, 1995 through March 5, 1998, in ERISA-covered employee benefit plans administered by Oxford and for which PCS provided PMB services pursuant to its Commercial Contract with Oxford."

[4]  Plaintiff withdraws his "party in interest" and "co-fiduciary" claims. (Plaintiff's Brief in Opposition to Summary Judgment at 36.)

3

("Pl's UMF") at ¶ 51.)  During the class period, PCS and Oxford were engaged in four service contracts.

Effective June 1, 1991, Oxford and PCS entered into a Recap System Agreement (the "1991 Contract").  (Stein Cert. Ex. K, "1991 Contract".)  The 1991 Contract remained in effect through February 28, 1997.  (Def's UMF at ¶ 10.)

Effective June 1, 1991, Oxford and PCS also entered into the Supplemental Drug Utilization Review ("DUR") Agreement (the "1991 Supp. Contract").  (Stein Cert. Ex. L, "1991 Supp. Contract".) The 1991 Supp. Contract remained in effect through February 28, 1997.  (Def's UMF at ¶ 14.)

Effective June 1, 1992, Oxford and Clinical Pharmacy Advantage, a predecessor of PCS, entered into the Pharmaceutical Management and Services Agreement (the "1992 Contract").  (Stein Cert. Ex. M, "1992 Contract".)  The 1992 Contract terminated on March 30, 1995.  (Stein Cert. Ex. N; Def's UMF at ¶ 17.)

Effective March 1, 1997, Oxford entered into a Managed Pharmaceutical Benefit Agreement with PCS (the "1997 Contract").[5] (Stein Cert. Ex. Q, "1997 Contract".)  The 1997 Contract terminated effective December 31, 1998.  (Stein Cert. Ex. R; Def's UMF at ¶ 25.)

As part of these contracts, PCS provided Oxford the

_____

[5]   In its July 17, 2003 Opinion, the Court refers to this contract as the Commercial Contract.  Mulder v. PCS Health Sys., Inc., 216 F.R.D. 307, 309 (D.N.J. 2003).

4

following types of concomitant services: claims processing,
formulary/ preferred drug list services, rebate services, and
drug utilization review/ therapeutic intervention services.

Plaintiff argues that in order to effectuate these services,
PCS entered into separate contracts with drug manufacturers that
provided PCS with rebates and fees based on the usage of the
manufacturers' drugs by PCS's clients.  The greater the usage of
certain drugs by PCS's clients, the higher the rebates and fees
that were paid to PCS.  (Plaintiff's Brief in Opposition to
Summary Judgment ("Pl's Opp. Br.") at 3.)  Plaintiff argues that
PCS was motivated by its own financial interests to insure that
its clients used specific drugs that yielded the highest rebates
and fees to PCS.  (Id. at 9.)  Plaintiff's single cause of action
alleges that PCS exercised discretionary authority in connection
with its drug prescription services and breached its fiduciary
duties under ERISA to plan beneficiaries by enriching itself at
the expense of the interests of those beneficiaries.  (Id. at 1.)

PCS now moves for summary judgment arguing that the
undisputed facts demonstrate that the alleged activities are
outside the scope of ERISA's regulatory framework and also that
PCS had no decision-making authority in exercising the challenged
activities as required by ERISA.

5

## II. DISCUSSION

### A. STANDARD OF REVIEW

Summary judgment will be granted only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 65(c).  Whether a fact is material is determined by the applicable substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue involving a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Healy v. N.Y. Life Ins. Co., 860 F.2d 1209, 1219 n.3 (3d Cir. 1988), cert. denied 490 U.S. 1098 (1989).

The moving party has the initial burden of showing that no genuine issue of material fact exists.  Celotex Corp. v. Carteret, 477 U.S. 317, 323 (1986).  If the moving party satisfies this requirement, the burden shifts to the nonmoving party to present evidence that there is a genuine issue for trial.  Id. at 324.  The nonmoving party "may not rest upon mere allegations or denials" of its pleading, Fed. R. Civ. P. 56(e), but must produce sufficient evidence to reasonably support a jury verdict in its favor, Anderson, 477 U.S. at 249, and not just "some metaphysical doubt as to material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In determining whether any genuine issues of material fact

6

exist, the Court must resolve "all inferences, doubts, and issues of credibility . . . against the moving party." <u>Meyer v. Riegel Prods. Corp.</u>, 720 F.2d 303, 307 n.2 (3d Cir. 1983) (citing <u>Smith v. Pittsburgh Gage & Supply Co.</u>, 464 F.2d 870, 874 (3d Cir. 1972)); <u>accord</u> <u>Aman v. Cort Furniture Rental Corp.</u>, 85 F.3d 1074, 1077 n.1 (3d Cir. 1996).

   **B. <u>FIDUCIARY STATUS UNDER ERISA</u>**

   The central issue before the Court is whether PCS acted as a fiduciary under ERISA.  ERISA provides that "a person[6] is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. . . ." 29 U.S.C. § 1002(21)(A).[7]

   "ERISA . . . defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan. . . ." <u>Mertens v. Hewitt Associates</u>, 508 U.S.

---

   [6]  ERISA's definition of a "person" extends to corporations. <u>See</u> 29 U.S.C. § 1002(9).

   [7]  An ERISA fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries,"  29 U.S.C. § 1004(a), and in performing services to the plan, the fiduciary must not "deal with the assets of the plan in his own interest. . . ." 29 U.S.C. § 1106(b).

248, 262 (1993).  "The statute provides that not only the persons named as fiduciaries by a benefit plan, see 29 U.S.C. § 1102(a), but also anyone else who exercises discretionary control or authority over the plan's management, administration, or assets, see 29 U.S.C. § 1002(21)(A), is an ERISA 'fiduciary.'" Id. at 251.  "[T]he linchpin of fiduciary status under ERISA is discretion."  Curcio v. John Hancock Mut. Life Ins. Co., 33 F.3d 226, 233 (3d Cir. 1994).  As this Court previously explained, to determine whether the claims are asserted against an ERISA fiduciary, the Court must ask "not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint."  Mulder v. PCS Health Sys., 216 F.R.D. 307, 313 (D.N.J. 2003) (quoting Pegram v. Herdrich, 530 U.S. 211, 222 and 226 (2000)).  "Even if an entity is an ERISA fiduciary for some purposes, therefore, not every action the entity takes must benefit plan beneficiaries." Id.  Fiduciary status "is not an all or nothing concept.  A court must ask whether a person is a fiduciary with respect to the particular activity in question."  Moench v. Robertson, 62 F.3d 553, 561 (3d Cir. 1995) (internal quotations omitted).

Pursuant to the four contracts in effect during the class period, PCS provided different services to Oxford.  Plaintiff's

Complaint alleges that PCS was a fiduciary in the following capacities: (1) by influencing the determination of which drugs would be covered by the plan, (2) in developing computer software to adjudicate beneficiaries' claims, (3) in negotiating contracts with drug manufacturers, (4) by creating pharmacy networks, and (5) by monitoring drug prescription practices.  (Complaint at ¶¶ 23, 24.)  Plaintiff alleges that PCS breached its fiduciary duties by: (1) selecting drugs to be included on PCS's drug formularies and preferred drug lists that generate the most income for PCS, (2) designing and implementing programs to persuade pharmacists and physicians to switch plan members' drugs to drugs that generate the most income for PCS, and (3) receiving unreasonable compensation through discounts and rebates from drug manufacturers.  (Id. at ¶¶ 34-42.)

### 1.   Claims Processing Services

Pursuant to the 1991 Contract and the 1997 Contract, PCS agreed to process claims submitted by Oxford members at pharmacies participating in PCS's retail pharmacy network, as well as non-participating pharmacies.[8]  (Def's UMF at ¶¶ 13, 29.)

---

[8]  PCS agreed to the following services under the 1991 Contract, many of which were also provided in the 1997 Contract:

* * *

2. Furnish each Member Pharmacy for inclusion in its PCS Operations Manual a description of the [Oxford plan] as approved by [Oxford] including [Oxford's] payment schedule for covered prescriptions.

PCS provided claims processing services to Oxford under an automated, electronic system, called the Recap System, throughout the class period.  (Id. at ¶ 103.)  PCS had complete responsibility for designing and implementing the computer claims processing databases.  (Pl's UMF at ¶ 55.)

When a member entered a pharmacy to fill a prescription that member would present their identification card.  The pharmacist would use the card to submit an electronic claim to PCS.  That claim information would show the member's name and the requested prescription.  At PCS, the information would automatically be processed and a computerized system would check to make sure that the claim was made by an eligible member and that the drug was covered by the plan.  The system would send the pharmacist co-payment information and whether a deductible was to be applied.

---

* * *

> 4. Process claims . . . and determine whether such claims qualify for reimbursement in accordance with the terms of the [Oxford plan] and the payment applicable to them; and return unacceptable claim forms to the submitting party.
>
> 5. Advise [Oxford] by means of a biweekly Statement of Account of the amount of payments which have become due on valid claims processed by PCS during the applicable period.
>
> 6. Furnish [Oxford] . . . with a computer produced summary of claim payments made by PCS under the [Oxford plan] during the preceding period. . . .

(Abrams Cert. Ex. 2, 1991 Contract, PCS-MU27009-27010; Abrams Cert. Ex. 5, 1997 Contract, PCS-MU1163-1164.)

Any amounts that were due the pharmacist would be billed by PCS every two weeks, collected, and disbursed to the pharmacies. (Abrams Cert. Ex. 16, Deposition Transcript of Susan De Mars ("De Mars Dep.") at 34:9-35:10; 35:24-36:14.)  If a plan participant disputed PCS's processing of a particular prescription drug benefit claim, the dispute had to be raised and resolved with Oxford.  (Stein Cert. Ex. I, Oxford Health Plan, AGS21.) Moreover, the ultimate responsibility of paying claims rested with Oxford.  (1991 Contract at PCS-MU 27010; 1997 Contract at PCS-MU 1152.)  Oxford paid PCS for its services regardless of whether the claim was granted or denied.  (Stein Cert. Ex. K, 1991 Contract at PCS-MU 27015; Stein Cert. Ex. Q, 1997 Contract at PCS-MU 1173.)

Plaintiff attempts to attach ERISA's fiduciary obligations to PCS by alleging that PCS had discretionary authority over its processing services.  Relying on Sixty-Five Sec. Plan v. Blue Cross & Blue Shield, 583 F. Supp. 380 (S.D.N.Y. 1984) and Greenblatt v. Prescription Plan Servs. Corp., 783 F. Supp. 814 (S.D.N.Y. 1992), Plaintiff asserts that PCS exercised discretion in developing its claims processing system as well as its network of participating pharmacies.  (Pl's Opp. Br. at 24.)  Plaintiff argues that PCS was solely responsible for the design, implementation, and administration of the claims processing, and that the delegation of such discretionary authority is sufficient

11

to establish PCS's fiduciary status.  (Id. at 27-28.)  In both
Sixty-Five Sec. Plan and Greenblatt, the courts held that the
"design and implementation of claims processing systems was not a
purely ministerial function, and that broad latitude in
performing administrative tasks was sufficient to establish
fiduciary status under ERISA." Greenblatt, 783 F. Supp. at 820
(citing Sixty-Five Sec. Plan, 583 F. Supp. at 387).  Those cases,
however, are not dispositive.  In Greenblatt, for instance, the
court found it "highly probative" of defendant's fiduciary status
that defendant maintained control over the fund's cash reserve.
Id. at 821.  Moreover, the court in Sixty-Five Sec. Plan noted
that the defendant exercised control over the plan assets and it
concluded that the discretion granted to Blue Cross made its
decisions in effect final.  Sixty-Five Sec. Plan, 583 F. Supp. at
386.

PCS has shown that it did not exhibit any discretionary
authority in its claims processing services.  The design,
implementation and administration of PCS's claims processing
services alone does not constitute the type of decision-making
authority that would render PCS an ERISA fiduciary.  See, e.g.,
Dep't of Labor Regulation, Interpretive Bulletin, 29 C.F.R.
2509.75-8 (D-2).  As the Third Circuit held in Confer v. Custom
Engineering Co., 952 F.2d 34, 39 (3d Cir. 1991), a plan
supervisor holds no discretionary authority where its "obligation

12

[is] to follow the written plan instrument and follow the instructions of the plan administrator."   See also Baker v. Big Star Div. of the Grand Union Co., 893 F.2d 288, 290 (11th Cir. 1989) ("An insurance company does not become an ERISA "fiduciary" simply by performing administrative functions and claims processing within a framework of rules established by an employer . . . especially if, as in this case, the claims processor has not been granted the authority to review benefits and make the ultimate decisions regarding eligibility.").

PCS's role in processing claims was merely ministerial.  PCS exercised no discretion because it processed claims according to Oxford's plan specifications.  (1991 Contract at PCS-MU 27008; 1997 Contract at PCS-MU 1151); Klosterman v. Western Gen. Management, 32 F.3d 1119, 1124 (7th Cir. 1994) (holding that the computer processing system developed by Western General did not, in and of itself, create a fiduciary status where the program was based upon the framework of the plan).  The Court finds that providing and maintaining its system for managing Oxford's drug benefit claims does not elevate PCS to an ERISA fiduciary.

### 2.   Formulary and Performance Drug List Services

Pursuant to the 1992 Contract and the 1997 Contract, Oxford participated in PCS's formulary drug services.  (Def's UMF ¶¶ 19, 34, 35.)  As part of its formulary development program, PCS worked with Oxford's Pharmacy and Therapeutics Committee to

create a list of drugs in certain therapeutic categories that were the most cost effective for Oxford.  (1992 Contract PCS-MU 26990; 1997 Contract PCS-MU 1168.)  The design of Oxford's formulary was closely aligned with the amount of potential rebates from drug manufacturers, described *infra*.

A formulary can be closed, meaning that the drug product selection that will be reimbursed under the plan is limited to those drugs on the formulary.  A formulary can also be open, which means that there are no limitations on the drug products that may be reimbursed under the plan. (Def's UMF at ¶ 20.)  PCS had a standard open formulary during the class period.  (Id. at ¶ 21.)  A Performance Drug List ("PDL") is also a list of drugs.[9] A PDL is a subset of the formulary that contains preferred drugs in certain therapeutic classes.  (Id. at ¶ 22.)   It is designed to encourage the selection of particular drugs.  As explained below, a plan provider, like Oxford, might increase its rebates from drug manufacturers by limiting a member's choices to a narrow list of drugs.

PCS had its own PDL that it reconstituted yearly.  (Pl's UMF at ¶ 69.)  PCS generated certain categories of drugs and drew in offers from manufacturers for placing their drugs on the PCS PDL. PCS would compare the contract offers made by different

---

[9]   The parties also refer to the Performance Drug List as a Preferred Drug List.  There is no indication of a difference between the two.

manufacturers and determine whether those offers could translate into value for its clients. (Abrams Cert. Ex. 18, Deposition Transcript of Jim Herrick ("Herrick Dep.") at 6, 14:8-16, 46:1-7.) PCS then offered its PDL and the list of manufacturers with which it had contracts to its clients. (Abrams Cert. Ex. 17, Deposition Transcript of Larry Faudskar ("Faudskar Dep.") at 22:3-18.) Depending on the varying degree of control the client chose to exercise over its own formulary the greater the value the drugs on the PCS PDL provided.[10] In other words, "the greater interest there [was] on the part of the manufacturer . . . the larger the discounts that [could be] offered and the lower price that the client would pay [for the drugs]. So each client [had] to weigh . . . [whether] to spend more money, or [whether] to spend less money and then balance that off against the degree of control [they were] willing to exercise with their client base." (Herrick Dep. at 16:14-24.) PCS's clients, however, were

---

[10] PCS grouped the degrees of control its clients exercised over their formularies and PDL's into five Levels of Clinical Management ("LCM"), with Level 1 being the least control and Level 5 being the greatest control. At Level 1 a PCS client has no formulary alignment with PCS. Level 2 provided for an open formulary where no controls were imposed. Level 3 involved participation in PCS's Performance Rx program in which electronic messages are sent to the pharmacist when a member fills a prescription for a non-preferred drug. Level 4 provided a higher degree of control, which included a differential co-pay for preferred drugs. Level 5, the highest LCM, included a closed formulary where a drug would not be reimbursed if it were not included on the formulary. The greatest value for a manufacturer, therefore, accrues when their product is favored on a closed formulary under an LCM of 5. (Pl's Opp. Br. at 10.)

not required to adopt its PDL.

The balance of Plaintiff's ERISA claims revolve around PCS's PDL/ formulary services.  Plaintiff asserts that PCS's decisions as to which drugs to include on its PDL were not "plan design" decisions but instead involved decisions about how the terms of the Oxford plan were to be implemented.  (Pl's Opp. Br. at 18.) Plaintiff claims that Oxford contracted with PCS for the purpose of receiving drug manufacturer rebates, as further explained below, and that PCS exercised complete discretion over the contracts it negotiated with the manufacturers.  (Id. at 20-21.) Oxford, in turn, accepted PCS's PDL with few changes to maximize its rebates and it allowed PCS to guide it into making changes beneficial to PCS.  (Id. at 21-22.)  All the while, Plaintiff purports, PCS was solely concerned with negotiating the highest rebates and fees for itself.  (Id. at 21.)

The Court finds Plaintiff's contentions lack merit.  First, the 1992 Contract clearly provides that PCS and Oxford would work together to develop a formulary "*acceptable to Oxford . . . tak[ing] into account both [PCS's] own recommendations* and any existing formularies now employed by Oxford."  (1992 Contract at PCS-MU 26990) (emphasis added).  Similarly, the 1997 Contract provides that "PCS and [Oxford] have agreed upon [Oxford's] preferred drug list to be utilized under this Agreement. . . ." (1997 Contract at PCS-MU 1168.)  Hence, the PCS-Oxford contract

16

did not delegate to PCS any discretionary authority over Oxford's formulary.

Secondly, the fact that PCS operated independently in negotiating contracts with drug manufacturers does not make PCS an ERISA fiduciary.  That is, PCS was not "acting as a fiduciary" during its negotiations with drug manufacturers.  Mulder, 216 F.R.D. at 313 (quoting Pegram, 530 U.S. at 226); see also New York State Teamsters Council Health & Hospital Fund v. Centrus Pharmacy Solutions, 235 F. Supp. 2d 123 (E.D.N.Y. 2002) (finding that a PBM's recommendation to adopt a drug formulary to be purely ministerial).  PCS contracted with drug manufacturers but it was for Oxford to decide if it wanted to include those drugs on its PDL.  (Herrick Dep. at 56:11-14; 38:20-39-:14; Faudskar Dep. at 29:2-10.)  Plaintiff again cites Sixty-Five Sec. Plan in support of its contention that Oxford's reliance on PCS's contracts with drug manufacturers is indicative of PCS's fiduciary status.  (Pl's Opp. Br. at 19-20 (citing Sixty-Five Sec. Plan, 583 F. Supp. at 387).)  For the same reasons stated above, however, the Court finds Sixy-Five Sec. Plan inapplicable.  Plaintiff also relies on AT&T Co. v. Empire Blue Cross & Blue Shield, 1994 U.S. Dist. LEXIS 21091 (D.N.J. 1994) for the same proposition.  But, the court in AT&T Co. was ruling on a motion to dismiss and the court specifically noted that the complaint alleged "that defendants exercised discretionary authority with

17

respect to the disposition of Plan assets . . . [in] their authority and responsibility to negotiate hospital Discounts. . . ." AT&T Co., 1994 U.S. Dist LEXIS at *24.  Oxford's decision to adopt portions of the PCS PDL was a plan design decision regarding the makeup of the plan.  See, e.g., In re U.S. Healthcare, Inc., 193 F.3d 151, 162 (3d Cir. 1999) (finding that an HMO acts as a "health care provider," rather than a "an administrator overseeing an ERISA plan," when "it arranges and provides medical treatment, directly, or through contracts with hospitals, doctors, or nurses.").  The activity challenged by Plaintiff was designed to control Oxford's drug costs by structuring its plan in a way that enticed plan participants to purchase less expensive drugs.  That being said, "ERISA's fiduciary duty requirement simply is not implicated where [the Plan's settlor] makes a decision regarding the form or structure of the Plan such as who is entitled to receive Plan benefits and in what amounts, or how such benefits are calculated.  A settlor's powers include the ability to add a new benefit structure to an existing plan." Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 444 (1999).  The Court, therefore, finds no justification to impose upon PCS ERISA's fiduciary duties where none could be extended to Oxford.

### 3.   Rebate Services

A parallel aspect to PCS's formulary services, described

18

above, were the rebate services.  The 1992 Contract and the 1997 Contract provided Oxford with these volume discounts services. (Def's UMF ¶¶ 18, 30.)  PCS's contracts with drug manufacturers included terms under which its clients could receive rebates based on volume of prescriptions filled by plan participants. (Herrick Dep. at 99:11-100:8.)  Another type of rebate offered was based on the percentage of the market share, *i.e.*, where a drug manufacturer receives a higher market share it would yield PCS's client a higher rebate.  (<u>Id</u>. at 101:15-24.)  The major driving force for negotiating these rebates and maximizing manufacturer competition was a drug's placement on the PCS PDL "[b]ecause that presumably would be the drugs that more people would use, thereby having the greater opportunity to increase the manufacturer's market share."  (<u>Id</u>. at 105:16-19.)

The 1992 Contract provided that Oxford would receive eighty percent of all rebates eared on Oxford members' utilization of their pharmacy benefits.  PCS retained twenty percent of those rebates as compensation.  (1992 Contract PCS-MU 26992.)  Under the 1997 Contract, Oxford acquired one hundred percent of all rebates.  (1997 Contract PCS-MU 1169.)  According to the 1997 Contract, PCS could, however, "receive fees or other compensation from [drug manufacturers] paid to PCS for its own account, including without limitation administrative fees not exceeding three percent (3%) of the cost of the pharmaceutical products

19

dispensed to [Oxford plan participants] and fees for services rendered or property provided to a [drug manufacturer] to the extent permitted by the Agreement and applicable law." (1997 Contract PCS-MU 1157.)

Similar to the allegations regarding PCS' PDL services, Plaintiff argues that PCS exercised discretionary authority over negotiating contracts with drug manufacturers which directly impacted Oxford's rebate returns. (Pl's Opp. Br. at 33-34.) Citing Am. Fed. of Unions, et al. v. Equitable Life Assurance Scty., et al., 841 F.2d 658, 663 (5th Cir. 1998), Plaintiff argues that the rebates PCS contracted for were for the benefit of both Oxford and PCS and "[a]s such, PCS had and exercised discretionary authority and control over negotiating with drug manufacturers, formulary management and drug-switching programs." (Id. at 34.) This argument, however, assumes, rather than proves, that the rebates were plan assets. Furthermore, in Am. Fed. of Unions the plan administrators commission was directly linked to his discretionary authority to paying claims; "his compensation increased with every payment." Am. Fed. of Unions, 841 F.2d at 663.

"[I]f a specific contractual term is bargained for at arm's length, adherence to that term, at a pre-determined price, is not a breach of fiduciary duty." Fechter v. Connecticut General Life Ins. Co., 800 F. Supp. 182, 199-200 (E.D. Pa. 1992); accord

<u>Trustees of Laborer's Local No. 72 Pension Fund v. Nationwide</u>

<u>Life Ins. Co.</u>, 783 F. Supp. 899, 908 (D.N.J. 1992).  PCS did not

acquire fiduciary status or have discretionary authority over

plan assets simply by contracting to receive its compensation for

services through drug manufacturer rebates.  <u>Id.</u>; <u>see also</u>

<u>Bickley v. Caremark Rx, Inc.</u>, 361 F. Supp. 2d 1317, 1332 (N.D.

Ala. 2004).  Plaintiff assumes that PCS had discretionary

authority or exercised discretionary authority with regard to the

plan simply because PCS acted as a middleman between drug

manufacturers and Oxford.  Plaintiff fails to show how PCS had

actual control or authority over the Oxford plan or plan assets.

Plaintiff is, in essence, seeking relief for actions that PCS

took in accordance with the terms of its agreement with Oxford.

### 4.   **Drug Utilization Review/ Therapeutic Intervention Services**

Under the 1991 Supp. Contract, PCS agreed to provide Oxford

with a drug utilization review ("DUR") program called Quantum

Alert.  (Def's UMF at ¶ 15; 1991 Supp. Contract PCS-MU 27022.)

The DUR system operated through the PCS Recap System, the

processing system explained above.  The DUR system scanned

prescription drug claims at the dispensing pharmacy for certain

types of potential clinical inappropriateness, such as dangerous

drug combinations, excessive or insufficient daily doses, or

excessive utilization.  (1991 Supp. Contract PCS-MU 27022.)  The

dispensing pharmacist would then be alerted by an on-line message

when a potential conflict existed.  (Id.)  The 1991 Supp.
Contract provides that "the DUR services, and any intervention
made as a result of the information, is intended as an economical
supplement to, and not a substitute for, the knowledge,
expertise, skill, and judgment of physicians, pharmacists, or
other health care provides in patient care."  (Id. at PCS-MU
27019.)

    By way of the 1997 Contract, Oxford again agreed to
participate in PCS's DUR program.  (1997 Contract PCS-MU1165.)
PCS also provided Oxford with "Retrospective DUR Services," by
which PCS sent "DUR letters" to targeted physicians describing
current pharmaceutical practices, reviewed patient profiles on a
quarterly basis, and had "interventions within specific
therapeutic classes, as mutually agreed upon by [Oxford] and
PCS."  (Def's UMF at ¶ 39; 1997 Contract PCS-MU 1165.)
Additionally, Oxford participated in an "academic detailing"
program as part of the DUR services.  (1997 Contract PCS-MU
1165.)  The academic detailing program involved having PCS's
clinical pharmacists "identify opportunities for appropriate
therapeutic interchanges consistent with the [PDL] and . . .
effectuate such interchanges by encouraging physicians to send
letters to patients with new prescriptions for preferred drugs in
those instances where physicians agree that an interchange is
appropriate."  (Id.; De Mars Dep at 136:14-137:24.)  The 1997

22

Contract provided that the "DUR services [were] intended as an economical supplement to, and not a substitute for, the knowledge, expertise, skill, and judgment of physicians, pharmacists, or other health care providers in patient care. . . . [and that PCS shall not] in any way substitute PCS'[s] judgment for the professional judgment or responsibility of the physician or pharmacist." (<u>Id</u>. at 1165-1166.)

Plaintiff stipulates that these programs were created by PCS and that Oxford only selected those it intended to participate in. (Pl's Opp. Br. at 23.) More specifically, Plaintiff argues that pursuant to the DUR and therapeutic intervention services of the 1997 Contract, PCS contacted Oxford plan physicians to persuade them to switch plan participants to preferred drugs. (<u>Id</u>. at 4.) PCS did so to collect the highest possible amounts in rebates and fees from drug manufacturers. (<u>Id</u>.) Plaintiff alleges that his prescription was switched based on PCS's DUR activities. (Pl's UMF at ¶¶ 93, 94, 95.) Plaintiff asserts that he had to pay more for the new drug, but that bald allegation is contradicted by other evidence. (Pl's UMF at ¶ 95; <u>see</u> Def's UMF at ¶ 95; Gorelick Cert., Ex. B.)

The Court notes that Plaintiff admits that the final decision regarding which drug to prescribe rested with the participants' medical provider. (Def's UMF at ¶¶ 16, 42.) Plaintiff's argument that the 1997 Contract provided PCS with the

discretion to contact a "member's physician to persuade the
physician to 'switch' the prescription" fails in light of the
terms of that contract.  (Pl's Opp. Br. at 14.)  The 1997
Contract expressly reserves for Oxford "the right to restrict,
expand or terminate" PCS's ability to contact member's physicians
at any time and requires that PCS "provide [Oxford] with monthly
reports of such activity."  (1997 Contract at PCS-MU 1165.)  It
also provides that "all retrospective DUR programs and protocols
must be reviewed and approved by [Oxford's] Pharmacy and
Therapeutics Committee."  (Id.)  Furthermore, Plaintiff does not
cite to any other evidence or deposition testimony that would
indicate that PCS acted outside the terms of the 1997 Contract.
See Chicago District Council of Carpenters Welfare Fund v.
Caremark Rx, Inc., 2005 U.S. Dist. LEXIS 7891, *7 n.1 (N.D. Ill.
April 14, 2005) (in a factually similar case, the court noted
that "[w]hen allegations in a complaint contradict a written
instrument attached to the complaint, the written instrument
controls.").

Merely "designing and implementing programs," as Plaintiff
argues, is not enough to show that PCS had discretionary
authority to persuade physicians and pharmacists to switch drugs
without Oxford's oversight.  (Complaint at ¶ 34.)  It is clear
that PCS provided services in accordance with the terms of the
1997 Contract and that those actions do not qualify PCS as an

ERISA fiduciary.  As the Third Circuit explained, those "whose activities are limited 'within a framework of policies, interpretations, rules, practices, and procedures made by other persons, fiduciaries with respect to the plan,' cannot be individually liable as fiduciaries under ERISA, since they fail to exercise 'the discretionary authority or discretionary control' over the plan required for the direct imposition of fiduciary liability." <u>Taylor v. Peoples Natural Gas Co.</u>, 49 F.3d 982, 987 (3d Cir. 1995) (citing Dep't of Labor Regulation, Interpretive Bulletin, 29 C.F.R. 2509.75-8 (D-2) and 29 U.S.C. § 1002(21)(A).  Since PCS merely created its DUR and therapeutic intervention services in furtherance of its business and rendered them in accordance with its contract with Oxford, without exercising any discretionary authority with respect to the plan, the Court concludes that PCS was not performing as an ERISA fiduciary.

**III. CONCLUSION**

For the foregoing reasons, the Court **grants** PCS's motion for summary judgment.

An appropriate Order follows.

Dated: April 11, 2006


          /s/ William G. Bassler          
          WILLIAM G. BASSLER, U.S.S.D.J.

25